UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| Dr. Elias Quintana, d/b/a Fort Gibson Investments, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>City of Muskogee, A political sub-Division of the State of Oklahoma, Dan Hurd, Individually and in his official capacity as Code Enforcement Manager, Jeff Strickland, Individually and in his Official Capacity as Code Inspector and Darrell Jones individually and in his Official Capacity as Fire Marshall, )<br>)<br>Defendants. ) | CASE NO:   19-CV-66-RAW |

## COMPLAINT

Comes now, Dr. Elias Quintana, doing business as Fort Gibson Investments (hereinafter referred to as "Quintana" or "Plaintiff"), a resident of Muskogee County, Oklahoma, by and through his attorney, Walter M. Benjamin, and brings this action against the named Defendants, for a Preliminary Injunction, and pursuant to 28 USC Section 2201 and FRCP 57, Declaratory Judgment seeking redress for violation of rights guaranteed to him by, but not limited to, the Fourth and Fourteenth Amendment to the Constitution of the United States, 42 U.S.C. Section 1983, the Civil Rights Attorney's Fee Awards Act of 1976, 42 U.S.C. Section 1988 and 28 U.S.C. Section 1343,and for his cause of action against Defendants alleges and states as follows:

### A. Parties

1. At all times herein, Plaintiff was an individual that is a citizen of the State of Oklahoma and residing in Muskogee County, State of Oklahoma. Plaintiff does business as Fort Gibson Investments having an investment in the City of Muskogee.

2. City of Muskogee was and still is a municipal corporation, organized and existing under and by virtue of the laws of the State of Oklahoma, and may be served with summons by serving the Municipal Clerk, or otherwise, pursuant to 11 O.S. $22-103. Defendants Dan Hurd, Jeff Strickland and Darrell Jones were and still are employees of the City of Muskogee.

### B. Jurisdiction

3. Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. Section 1331, as amended, specifically, 42 U.S.C. Section 1983, 42 U.S.C. and Section 1985.

### C. Venue

4. The venue is proper in this district under 28 U.S.C. §1402(b) because Plaintiff resides in this district as a resident of Muskogee County, State of Oklahoma and because the act complained of occurred in this district in the City of Muskogee.

### D. Exhaustion of Administrative Remedies

5. Defendant City of Muskogee is an Oklahoma Political Subdivision subject to .Title 51 §151 *et seq*. Plaintiff has begun a claim pursuant to that act but that claim has not been exhausted, Plaintiff is not making the State tort claim at this time,

### E. Statements of Facts

6. Plaintiff owns a 15 unit apartment complex called the Cherokee Apartments located at 2701 S. Cherokee Street in the City of Muskogee.

7. On Thursday, June 25, 2018, an individual, upset at her boyfriend, threw a gas filled "Molotov cocktail" into apartment No. 6 at the Cherokee Apartments causing a fire which was contained within said apartment which apartments are divided by concrete cinder block walls and which caused cosmetic fire damage solely within apartment #6.

8. The resulting fire damage was limited to apartment 6, leaving all electrical wiring unscathed. [As verified by BOTH inspectors, there was **NO electrical damage** within

Apt #6 or any other units; therefore, there was NO basis for claiming exigent circumstances!]

9. The adjoining Apartments, Numbers 5 and 7 did not suffer ANY fire damage but suffered minor water damage as a result of the firemen extinguishing the fire in Apartment No. 6. None of the other apartments suffered any damage whatsoever.

10. The City of Muskogee Fire Marshal, Defendant Darrell Jones, (hereinafter "Fire Marshall") was called to the scene on the date of the fire and performed his regular duty of determining the cause of the fire which he confirmed was **an arson**.

11. Defendant **Fire Marshall called Renfrow Electric** to the scene and whose employee electronically isolated Apartment No. 6 from the other apartments so that it could not be a danger to the other apartments. Further he pulled the breakers to Apartment No. 6, and the adjoining apartments identified as apartments 5 & 7 as a precautionary measure due to the water damage caused by the firemen while extinguishing the fire in Apartment 6. The Plaintiff was present at the scene when the breakers were pulled. The Defendant Fire Marshal represented to Plaintiff that his **sole function** at the scene was to determine the cause of fire, which he did verify that it was solely an arson fire caused by the maltov cocktail and was exclusive of any electrical wiring issues being the cause of the fire. There was **NO electrical involvement in the fire, NONE.**

12. The **Fire Marshall also called OG&E** to determine if the meter needed to be pulled although the Fire Marshal was now acting **outside his jurisdictional authority** and training. The representative from OG&E showed up at the scene and was being **pressured by the Fire Marshal** to pull the meter despite again acting **without authority or training** as an electrical inspector. Subsequently, the Fire Marshal (**via phone**) contacted the Defendant, Dan Hurd, the City of Muskogee Code Enforcement Manager, and recommended to Hurd and the OG&E representative to remove the Electrical Meter that controlled the entire Apartment Complex.

13. **VIA PHONE conversation only,** Defendant, Dan Hurd, agreed with Defendant Fire Marshal with regard to the removal of the meter which was immediately removed. Plaintiff [being present at the scene] noted that the Building Inspector Supervisor, Mr. Hurd, **NEVER came to the scene on the day of the fire** and made his determination SOLELY based on the recommendation of an **unqualified** Fire Marshall. Moreover,

upon making such determination, while on the phone, the Plaintiff asked the Fire Marshal to allow him to discuss the matter with the Supervisor, Defendant, Dan Hurd. Defendant, Hurd, while on the phone and not once being present on the scene on the day of the incident, advised Plaintiff that the reason for the drastic measure of pulling the meter and displacing 15 families was due to the some unknown "possibility of **electrical arcing** issues" **despite knowin**g the breakers and electricity to the subject apartment 6 and the two adjoining apartments had been segregated and made nonoperational and excluded from the other non-affected apartments. [Hence,any electrical problems were now **IMPOSSIBLE**!]  Notwithstanding this knowledge and without consulting the electrical Code Inspector, Defendant, Jeff Strickland, Defendant, Dan Hurd made the drastic and **unqualified** decision to displace all fifteen families [HOMELESS] residing at the apartments.

14. Because of the removal of the meter, the apartment complex was made uninhabitable and Defendant, Dan Hurd, in concert with the fire marshal, Defendant, Darrell Jones forced all residents (Under overt threat of arrest) to move immediately from the premises despite the fact that most of these residents (12 apartments) were not affected by the fire or water damage. Many having to leave behind their personal property and valuables.

15. Plaintiff further questioned Defendant Hurd as to why the meter had to be removed when a licensed electrician had isolated Apartment No. 6 from the other Apartments with NO response!

16. The next day and after the meter was pulled, the Plaintiff met with both the electrical inspector, Jeff Strickland and his supervisor, Dan Hurd. It was at that time and upon further questioning by Plaintiff, that Mr. Hurd **admitted** that he just knew enough about electrical *"to be dangerous"*. Despite this admission, Defendant, Dan Hurd, [Totally unqualified/incompetent] made a **critical decision** to claim an exigent circumstance and to displace 15 families **without consulting the electrical code inspector or anyone else!** It was also pointed out by Plaintiff and acknowledged by both Inspectors that the ceiling and wall wires in the affected apartment, #6, remained "unscathed" [no damage] by the subject fire. Moreover, it was recommended by both the fire marshal (on the day of the incident) and the inspectors (on the day after the incident and in

direct violation of ethical requirements in most states) to contact (ONLY ONE CONTRACTOR) Renfrow Electric which Plaintiff did. Renfrow Electric subsequently came to the scene after the inspectors left and after a "cursory viewing" of four apartments, the manager at Renfrow Electric indicated it would cost the Plaintiff $15,000 for a new [higher power?] meter (unnecessary and FREE from OG&E) and that the cost for panels in each apartment was $60,000 (Also unnecessary and extreme overcharge) while claiming it would take a week to do each apartment. Thereafter, Plaintiff contacted Rick Flores, a highly qualified graduate engineer, to get his opinion as to the situation and expenses that were quoted by Renfrow's manager. Mr. Flores advised Plaintiff that he questioned why there would be a charge for the meter since the meter is typically provided by the electrical company **for free**. Thereupon, Plaintiff contacted OG&E whose representative verified that any meter was **provided for free** despite the fact that Renfrow Electric wanted to charge Plaintiff $15,000 for a "freely supplied" meter and after being recommended to do business with Renfrow Electric by the Code Inspectors and the Fire marshal. In addition, the consultant highly questioned the NEED for panels in each apartment as the NEC code requires that panels are NOT to be placed in each apartment!!! [IN addition, the cost of $4,000 per unit was EXTREME and approximately TEN TIMES the consultant's estimate of $300 to $400 per unit (total of $4,500 to $6,000) as was later verified by the consultant's expert electrical contractor using California pricing which is far greater than in Oklahoma!]

17. The Apartment Complex has 15 apartment units, nine large (1 bedroom) apartments and 6 small (efficiency) apartments. The apartments have one meter which serves all 15 tenants, with electrical panel boxes in 4 various other locations, (including# 1,4, 12, and 15), with breakers marked and designated for each respective/individual apartment. The subject apartment complex had a live in on-site General Manager who had access to the cutoffs for each apartment.

18. Less than 5 years previous to this fire the subject apartment complex, passed Code inspection by Dan Hurd and another electrical inspector. At that time there was no mention of requiring individual panels for each apartment or a "larger capacity" meter. Dan Hurd acknowledged that Plaintiff's apartment did in fact pass inspection at that time several years ago prior to the subject event involving arson. [Note: Both Mr.

    Hurd and Mr.Strickland demonstrated the incompetence when they falsely claimed the the current limit for the power meter was 200 amps. In his reports and after Mr. Hurd made this false claim in the Appeal Hearing, the consultant corrected their blatant error by noting that the figure of "200 Amps" is an ANSI requirement to establish limits purely for ACCURACY and NOT capacity!!! While it is estimated that the meter could easily handle over 1000 Amps and that the actual MAXIMUM current requirement for the apartments was BELOW 100 Amps! To use a power meter ABOVE its "real" capacity limit would NOT represent a "safety-related" hazard to anyone; as it would simply limit the current available; hence, there was NEVER any safety-related "hazard" and the removal of the meter by Mr. Hurd was **as unwarranted as it was illegal!**

19. More than a month after the fire, Mr. Hurd orally discussed what Plaintiff need to do before his meter could be reinstalled and informed Plaintiff that a "Higher capacity" meter had to be installed [Even though the present meter had MORE that sufficient capacity!!!] because they determined that the apartment complex needed higher power for the complex; despite such need being refuted by Plaintiff's consultant Engineer, Mr. Flores. Further, Plaintiff was informed that he had to equip each apartment with a separate panel despite such being **contrary to NEC Code requirements**. [Note that the consultant refuted the incompetence of both defendants', Hurd and Strickland, as the reference to "200 Amps" on the Meter ONLY refers to the ANSI accuracy requirements and is NOT related to "Capacity" in any way!!! In addition, the consultant noted that the average MAXIMUM usage for the complex was less than 70 Amps and NOT the "600 Amps" quoted by Defendants, Hurd and Strickland. The consultant attempted to correct the defendants one numerous occasions including via a **two formal reports** sent to the defendants, but the defendant inspectors refused to consider the valid input!!!]

20. Over **30 days AFTER** the fire and after numerous requests for documentation from the Plaintiff, Defendant Dan Hurd (finally) issued a "letter" [Which was NOT dated, signed, nor authorship noted!] condemning the subject property without any notice of hearing or means for appeal and without delineating any specific Code violations or other safety-related concerns.

21. The work as required by Defendants Hurd and Strickland [Which they referred to as a **"good Plan"** in later documentation and at the appeal hearing!] required (1) the

purchase of an electric power meter as quoted by Renfrow Electric [who was recommended by the City of Muskogee via the fire marshal] as costing $15,000, but electric meters are **supplied free** by electric providers, OG&E [and the defendants Hurd and Strickland and ALL electrical contractors ALL KNOW are FREE!] and (2) to install panels in EACH unit [Which is in DIRECT VIOLATION of NEC code requirements] which Renfrow quoted at $60,000 even though. Other contractors were contacted by the Plaintiff who quoted lesser rates that were increased substantially after discussing the City mandates with the Defendants Hurd and Strickland. Plaintiff would receive a significantly less verbal quote from several contractors that significantly **increased** after meeting and discussing the matter with the Defendant code Inspectors. Plaintiff's Consultant has significant experience with the construction environment and has often encountered such corruption [Claim that un-needed work was required and charging **insane** prices to extort money in order to complete a construction project or "clear" a facility of violations] and feared such a situatoin after speaking with defendants Hurd and Strickland on the phone on 6/21/18. The consultant was alerted after Mr. Strickland ONLY wanted to discuss the financial condition of the plaintiff rather the the specifics of his concerns. He was further alerted after Mr. Strickland made false claims to him concerning (1) overuse of extension codes which did NOT exists and (2) lack of smoke detectors which also did NOT exist!! After numerous comments concerning "COST", Mr. Strickland finally commented that (a) panels were required in EACH unit and (b) that attic isolators were required as well. The consultant questioned his accuracy as the consultant KNEW that NEC code that that NEITHER were required!!! IN addition, neither WOULD meet the standards as an "exigent condition" and as such, the removal of the meter was NOT LEGAL!!! Strickland then attempted to claim that the city had "separate and Unique" codes [false statement] while trying [falsely] to claim that the consultant was not qualified!! [The consultant has 3 engineering degrees and 40 years experience while Strickland has NO degrees...]

22. The electric contractors Plaintiff was recommended in using was charging extremely high rates for the work that were not code violations.

23. Plaintiff consulted with a highly qualified electrical engineer, Rick Flores, who had further discussed the matter with both Code inspectors [as stated above] on 6/21/18,

the day after the fire in the afternoon. Again, Defendant Dan Hurd admitted his ignorance about electrical to the consultant and; thereafter, referred Mr. Flores to Jeff Strickland, the electrical Inspector. Mr. Flores indicated to Plaintiff that Mr. Stickland in his conversation with Mr Flores continued to emphasize the "*great cost*" that the plaintiff was facing and questioned just "*how much money the owner had to repair the complex?*". Moreover, Mr Flores indicated that Mr. Strickland could **not answer** his technical questions and it was made obvious that Mr. Strickland was also very limited in his knowledge about electricity and why there could be any legitimate reason to remove the meter and displace 15 families except for the one who resided in the burned unit. Mr. Flores further informed Plaintiff that there were no code violations and there was no reason for the removal of the meter for safety or exigent circumstances or reasoning.

24. Plaintiff along with Flores requested an official notice of which code violations were violated,

25. More than 30 days later despite several prior requests by Plaintiff and the consultant, defendant Hurd provided Plaintiff with the following alleged code violations:

    Upon inspection of the building we found numerous violations:
    a. We found units 15 & 16 located in a separate building being fed through the main building. 230.3 National Electric Code
    b. We found no disconnecting means in the majority of the apartments. National Electric Code 230.72 & 210.18
    c. We found there to be no fire separation between the units. International Building Code 420, 707, & 708
    d. We found the service size to be inadequate to service the number of occupancies. International property Maintenance Code 604.2
    e. We found improper or no heating facilities in the majority of units. 602.2 - - International Building Code and 620.2 International fuel gas code.

26. Any qualified engineer would find that the "alleged" code violations (especially the removal and replacement the meter) were, in engineering terms, "BOGUS" and could only be asserted by a code inspector who was **totally and absolutely lacking in their qualifications and/or CORRUPT** both in terms of knowledge of electricity and in terms of interpretation of codes as (1) there were NO violations [as noted in reports 1 and 2] and (2) the meter (a) had MORE than sufficient capacity but (b) could be replace for FREE.        ,.

27. In spite of numerous attempts by BOTH the plaintiff and the consultant to demonstrate to Defendant Hurd that the alleged violations (especially the electrical violations) were unfounded and (later) possibly motivated by corruption, it was to no avail.   Defendant Hurd refused to discuss the situation or even respond to the consultant's reports.

28. It was not until numerous (~4) months later that the Plaintiff was advised that he could appeal to the City of Muskogee Uniform Building Code Appeals Board.

29. The Appeal was requested and held on November 27, 2018, at which the board told the plaintiff that his consultant (1) would have a speakerphone available to be included in the discussion [did NOT happen] and, during the hearing, informed the Plaintiff that his consultant could testify and respond to the City's presentation after the City completed its presentation [The Consultant was NEVER allowed to do either, testify or respond! How as this an "appeal"?]  The City simply referred to a poorly organized summary sheet (1) NO author identified, (2) NO signature, and (3) no date and which made new/additional claims of alleged code violations (a) NONE of which were true/valid and (b) none of which were "safety-related" or which could be used to claim "exigent circumstances; hence, the initial removal of the meter was unfounded, ILLEGAL, and unwarranted!!!  The resulting attempts to "COVER UP" the blatant error via an endless misinterpretation of codes has also proven to be FALSE! The entire situation is the result of (1) ABUSE OF AUTHORITY, (2) ARROGANCE,(3) CORRUPTION, AND (4)INCOMPETENCE (On many levels). The fact that the city has refused to return the meter given the circumstances verifies this!  Ultimately, the city (undocumented after the meeting)
held that Plaintiff could get his meter reinstalled if Plaintiff would (1) install the fire separation alleged in code violation in Paragraph 20(c)  above and replace fire extinguishers and smoke detectors which was stolen after the fire and residents vacated the apartments but refused to document this!!!

30. Said fire separation was **no code violation** [The apartments were separated by cinder block walls extending to the ceiling (decking) per the code.] as confirmed by Plaintiff's engineer Flores and the code was satisfied since barrier walls must only extend to the ceiling / decking not the roof line as **misinterpreted** by the Code inspectors, which again is a demonstration of their lack of understanding and training.

31. At all times of the above facts the City of Muskogee had no professional engineer available to make the decision to remove an electric meter and that decision was left to Defendants, Fire Marshall Darrell Jones and Supervisor, Dan Hurd who are not electrical engineers NOR competent to make such a decision and Dan Hurd (who made the actual decision to remove the subject meter) has NO training to determine the basis of any exigent circumstances to justify displacing 15 families on fixed incomes and without just cause. Again, it is critical to note that Defendant Dan Hurd admitted to both Rick Flores and Plaintiff that he was not an electrical expert and admitted to Plaintiff that he " knew enough about electrical to be dangerous".

32. At all times of the above facts the City of Muskogee's policy in place to determine what is an immediate danger requiring the removal of an electric meter was left to Fire Marshall, Darrell Jones,and Dan Hurd as "authorized" decision makers.

### F.  COUNT I – INJUNCTIVE RELIEF AGAINST DEFENDANT CITY OF MUSKOGEE UNDER 42 U.S.C. §1983

33. Plaintiff re-allege and incorporate the foregoing facts as if they were fully set forth herein.

34. The Plaintiff, Dr. Elias Quintana, is entitled to injunctive relief under 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution;

35. And for which the Plaintiff respectfully request that the Court enter judgment in here and: against the Defendant City of Muskogee and direct the following relief

   A. For injunctive relief requiring the City of Muskogee to immediately allow Plaintiff's electric meter to be reinstalled.

   B. Reasonable Attorney Fees under 42 U.S.C. §1988,

### G..  COUNT II – DECLARATORY RELIEF AGAINST DEFENDANT CITY OF MUSKOGEE UNDER 42 U.S.C. §1983

36. Plaintiff re-alleges and incorporates the foregoing facts as if they were fully set forth herein

37. The Plaintiff, Dr. Elias Quintana, is entitled to declaratory relief under 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution;

38. And for which the Plaintiff respectfully request that the Court enter judgment in HERE and against the Defendant City of Muskogee and direct the following relief:

   A. For declaratory relief declaring that the City of Muskogee is without sufficient process for the removal of electrical meters.
   B. Reasonable Attorney Fees under 42 U.S.C. §1988,

### H. - COUNT III – COMPENSATORY RELIEF AGAINST DEFENDANT CITY OF MUSKOGEE UNDER 42 U.S.C. §1983

39. Plaintiff re-alleges and incorporates the foregoing facts as if they were fully set forth herein

40. The Plaintiff, Dr. Elias Quintana, is entitled to compensatory relief against the Defendant City of Muskogee under 42 U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution;

41. And for which the Plaintiff respectfully request that the Court enter judgment against the Defendants and direct the following relief:

   A. For money judgment representing compensatory damages for lost rents plus interest amounting to:$7000 PER MONTH FOR EACH MONTH THE THE SUBJECT APARTMENTS HAVE BEEN OUT OF OPERATION WHICH TO DATE OF FILING EXCEEDS $80,000 WITH ONGOING DAMAGES UNTIL SUCH TIME AS THE APARTMENTS BECOME OPERATIONAL
   B. For money damages representing compensatory damages for the present cost of professional engineer and attorney's fees amounting to: $400,000 and increasing as time progresses. [Note: Because of the corruption, abuse of process, and incompetence on the part of the city, the consultant has been forced to spend at least twice as much time as would normally be required. For example,because of the ever-increasing number of "alleged" code violations (A typical indication of corruption), pathetically poor documentation, and absurd allegations related to "qualifications and license requirements (Where the city is unable to read their own regulations), the consultant has been forced to properly document their

       false accusations (misinterpretations and/or misapplication of the codes and false/fraudulent innuendos) and respond to their poorly written documents and false "reports" as well as the absurd Load calculations. This wastes a large amount of time and should be paid for by the people who caused the ridiculous expense; The City and its officials.]

    **C.**    For money judgment representing compensatory damages for the cost for vandalism to the apartment complex amounting to the sum of $107,000.00.

    **D.**    For money judgment representing punitive damages for the Defendant's willful violation through its officials in the amount of $1,500,000.00.

    **E.**    Reasonable Attorney Fees under 42 U.S.C. §1988,

### F. COUNT IV – COMPENSATORY RELIEF AGAINST INDIVIDUALS UNDER 42 U.S.C. §1983

42. Plaintiff re-alleges and incorporates the foregoing facts as if they were fully set forth herein.

43. That Dan Hurd and Jeff Strickland fraudulently and maliciously "mis-used" [Intentionally misinterpreted and misapplied] (false claims of) violations of codes and ATTEMPTED TO force (Extort) Plaintiff to ENGAGE certain contractors to do unnecessary work at extreme expense. [Quoted Plaintiff $75,000 for work valued at less than $6,000 and NONE of this work was needed!]

44. The Plaintiff, Dr. Elias Quintana, is entitled to compensatory relief against Dan Hurd and Jeff Strickland personally under U.S.C. §1983, and the Fourth and Fourteenth Amendments to the United States Constitution;

45. And for which the Plaintiff respectfully requests that the Court enter judgment for him and against the Defendants Darrell Jones, Dan Hurd and Jeff Strickland for the following relief:

    **A.**    For money judgment representing compensatory damages, including
    **B.**    For money judgment representing punitive damages for the Defendant's willful violation through its officials;
    **C.**    For money judgment representing prejudgment interest;
    **D.**    Reasonable Attorney Fees under 42 U.S.C. §1988,

### G. JURY DEMAND

46. The Plaintiff herein demand a trial by jury.

**WHEREFORE** Plaintiff, Dr. Elias Quintana, respectfully request for judgment in his favor against the Defendants and for any and other relief the Court deems fit and proper.

                    Respectfully submitted,
                    Dr. Elias Quintana

By:    /s/ Walter M Benjamin
         Walter M. Benjamin  OBA 702
         436 Court Street Suite A
         Muskogee, OK 74401
         (918) 686-6663
         (877) 532-0369 Fax
         wabenj@Juno.com