UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DR. ELIAS QUINTANA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| -vs- | ) CASE NO. 19-CV-00066-RAW |
| | ) |
| CITY OF MUSKOGEE, a political | ) |
| Subdivision of the State of Oklahoma, | ) |
| | ) |
| Defendant. | ) |

**MOTION FOR RELIEF FROM JUDGMENT PURSUANT TO FED RULE 59 & TO STAY PROCEEDINGS AND RESPONSE TIME TO DEFENDANT'S BILL OF COSTS IN VIEW OF THIS MOTION**

COMES NOW THE Plaintiff, pro se and pursuant to FRCP 59 E asserts his grounds therefore as follow:

### INTRODUCTION

It is blatantly obvious from reading this Court's Opinion [Doc 247] that it has been misled on several levels as follow:

> The Court admits that the International Property maintenance Code (IMPC) is the controlling law in Muskogee, Oklahoma; however, this Court has been misled on the MOST crucial part---it is clearly a STRICT LIABILITY CODE NOT ALLOWING FOR DEVITION FROM ITS MANDATES, SPECIFICALLY AS TO NOTICE, COMPETENCE, GOOD FAITH, etc. Furthermore, the law explicitly invokes DUE PROCESS and that the intent of the IPMC is to protect the public safety and welfare. It specifically delineates the protocol necessary to satisfy the controlling law. There is no room for interpretation, as it is explicitly spelled out. The law is overwhelmingly and convincingly clear concerning how the Supreme Court and other courts treat **Strict Liability Statutes and Codes** as delineated below. Moreover, and with all due respect this Court has misapplied the controlling law in a way that deviates from the

1

standard and intent of the IPMC to provide equality to Code inspectors and the property owner conducive with the creators of the IPMC concerning the promotion of the safety and welfare of the public and protect due process rights.

Most disturbing is the lack of respect for Richard Flores, who is the only one in this entire litigation that has the unique qualifications and expertise gained from the top University in the world for engineering, worked for the top lab in the world {a 3.95 grade point average was the minimal requirement to be eligible to work at Sandia Labs which has been preeminent in developing protocols for constructing and operating nuclear facilities [electrical, fire hazard protocols, etc]. Moreover, Mr. Flores has special training by Code Enforcement lawyers and is well-respected in his fields of endeavor. Despite all his credentials, this Court fails to show any deference to Mr. Flores' world class credentials or his analysis which conforms to the IPMC, the controlling law.  Moreover, Mr. Flores produced several peer-reviewed publications concerning, compliance with all applicable codes, CFR's and orders, fire (Design and safety), high and low voltage electrical systems/hazards, and performed design analysis and inspected nuclear sites for various hazards including nuclear hazards at civilian and defense facilities world-wide.  Plaintiff initially met Mr. Flores on a professional level when he served as an expert for accident reconstruction. Over the last 38 years, Mr. Flores has worked for Plaintiff as a consultant and expert and has proven himself to be not only brilliant with unique training and expertise, but has earned the respect of many judges and lawyers throughout this country. We prevailed in every case because of his expertise and People skills.  Mr. Flores' reputation and expertise remains irrefutable and incontrovertible. He is deserving of this Court or any Court's respect. As an individual, Mr. Flores is a humble, self-less man of integrity and honor. Without his children's mother, he raised two boys and dear premature twin daughters, who passed in their early 20's. (Birth Defects) He raised all of them in a loving and caring environment. He retired early from Sandia Labs to devote more time to his children while sacrificing time and money to do so. Mr. Flores is one in a million and deserves this Court's respect not just as an individual but as an over-qualified expert concerning this case.

## UNDISPUTED FACTS

There are two sets of "undisputed facts: Those provided by the Plaintiff and those from the Defense.  ALL of the defense "facts" presented in docs 194 & 229 were thoroughly disputed in Plaintiff's documents 225, Exhibit 2 & 241, Exhibit 1 . Hence, the defense no longer has any remaining "undisputed facts". The defense has failed to refute ANY of the Plaintiff's undisputed facts; consequently, the Court is required to accept them as "Factual", and a summary judgment in favor of the Plaintiff is warranted. These facts are presented here.

1. The IPMC is the "foundational" international code for the case at bar, and the IBC does NOT apply to the case at bar. [Doc 241, Exhibit 1, 1.3]

2. Strict Liability - The IPMC invokes "Strict Liability"; hence, the City is required to comply with every and ALL of the IPMC requirements without any "latitude". [See Doc 241, Exh 1 & Attachment 1, Strict Liability]

3. The City has failed to comply with ANY of the requirements of IPMC Chapter 1. [Doc 241, Exh. 1, sec. 1.1]

4. The City Staff have failed and refused to comply with ANY of the requirements of IPMC Chapter 1. {Doc 241, Exhibit 1, sec. 1.1]

5. All of the City Staff were shown to be totally unqualified to perform their duties under IPMC Chapter 1. [Doc 241, Exhibit 15]

6. Plaintiff's expert was shown to have "World Class" (education, training, and experience) qualifications regarding Technical (Engineering – electrical, thermodynamics, etc.), Hazard analysis (Electrical and fire hazards), and code knowledge. [Doc 241, Exhibit 14]

7. License - There are NO requirements for a license for a Consultant in the State of Oklahoma. [OAC 158:40]

8. Availability of "City Codes" – The City has never provided the Plaintiff with any codes or code information. .

9. Local Codes – The city has never used any local codes.

10. Conclusory Statements - The conclusions and facts presented in docs 195 and 241 were Not conclusory because they were all supported by (1) world-class education and training, and (2) the statements resulted from Mr. Flores' 50 years of code experience and Attachment B, CV]

11. Plaintiff's Undisputed Facts - The defense has failed to refute ANY of the claims or undisputed facts presented by the Plaintiff's Expert. [Docs 225, Exhibit 2 & 241, Exhibit 1]

12. No Hazard - On 6/21/18, NO hazard existed at the complex to justify the removal of the power meter [per IPMC 108 and 180. 2.1] which made 15 families homeless for NO legitimate reason. [Docs 225, Exhibit 8, Hazards, and Exhibit 1, summary]

13. Hurd Inspection - Code Official, Mr. Hurd, failed to inspect the property before demanding removal of the meter and, thereby, the utilities were improperly and unjustifiably disconnected.

14. My Inspection - The Court erroneously states that Mr. Flores did NOT inspect the property which is simply incorrect [Doc 247 page 9] as he physically inspected the properly 2 years prior to the fire and remotely inspected it on 6/21/18 and subsequently. [doc 195, Exhibit 2]

15. Fire-damaged wiring – The fire-damaged wiring shown in the photos was NOT the main line running from the main panel to the panels in units 1 and 4, but only a minor line running from the panel in unit 4 to the overhead lines in unit 6. [Doc 241, Exhibit 4 and doc 225 Exhibit 2]

16. Disconnection of Damaged wiring - Contrary to the statements accepted by the Court in Doc 247, there was NEVER any "problem" disconnecting the damaged wiring as the maintenance man had disconnected the wiring to units 5 through 7 BEFORE the Fire Department arrived. Therefore, any potential "damaged wiring hazard" was removed BEFORE the Fire Department arrived!!! [Doc 241, Exhibit 4 and doc 225 Exhibit 2]

17. Notice – No type of notice regarding code violations, hazards, disconnection of utilities, or appeals were ever provided they the City Staff. [Doc 241, Exh. 1, Summary]

18. Authority – Mr. Hurd did NOT have any "authority" to remove the Power Meter on 6/20/18. [Doc 241, Exhibit 1, sec 1.3.2, page 13] Mr. Hurd FAILED to inspect the property on 6/20/18, and failed to meet ANY of the IPMC requirements to act under the authority of the IPMC.

19. Appeal – The Plaintiff was denied a "meaningful Appeal"! As shown in doc 241, Exhibit 1, sec 1.1.5, the City Staff refused to comply with ANY of the IPMC requirements to ensure a "meaningful" appeal. In addition, Plaintiff's Expert was NEVER allowed to testify. [Doc 241, Exhibit 1]

20. Due process – Plaintiff's expert claims that the Plaintiff has been denied "Due Process" per the IPMC because (1) The court erroneously applied the IBC (which does NOT apply to the case at bar [Doc 241, Exhibit 1, sec.1.4]) and, as a result, did not properly evaluate this case regarding "authority", (2) The court failed to properly apply the IPMC [Doc 241, Exhibit 1, sec.1.3] and apply its requirements for authority, [doc 241, Exhibit 1, sec 1.3], (3) The Court failed to apply "Strict Liability" to the case at bar [Doc 241, Exhibit 1, Sec 1.5], (4) by failing to require compliance with ALL of the IPMC chapter 1 requirements, the Court denied due process to the Plaintiff. [Doc 241, Exhibit 1, sec 1.1]

21. Success at Trial – Plaintiff's expert believes that this case has an excellent chance of success at trial. It is apparent that the Court has not thoroughly investigated the qualifications of the Plaintiff's expert. With over 50 years' experience in construction, engineering, codes, hazard analysis, Expert witness/consultant and as a former code official, Plaintiff's expert is qualified to provide an opinion regarding potential success. More importantly, the Court LACKS critical knowledge because the Defense never took the deposition of Plaintiff's expert! (This Court lacks the foundational knowledge of Mr. Flores' until he is allowed to testify at a trial!)

22. Shocking – The Honorable Court has failed to note numerous disturbing actions, unethical behaviors and criminal acts regarding the City and City Staff that can only be

described as "Shocking". [Doc 241, Exhibits 1, 2, 7, 8, 9, 10, 13, and 15 expose numerous indisputable "facts" that can only be described as "Shocking".]

23. Red Flags – As discussed above (Item 22), Plaintiff's expert noted numerous and extreme "red flags" regarding the activities, behaviors, and documents (lack thereof) from the City staff that were obvious for (1) unqualified staff, (2) unethical Staff, and (3) abuse of authority/power and (4) abuse of the public's rights under the IPMC. As a highly-qualified engineering, consultant, and former code official and construction worker with over 50 years code experience, Plaintiff's expert has learned to identify "Red Flags" for unqualified and/or unethical Code Officials. (For example, refusal to provide notice per the IPMC, poor quality and/or fraudulent documents, refusal to put "any agreements" in writing, unable to properly apply the codes, making false or deceptive statements, etc. indicate disingenuous intentions. His type of detailed explanations, incredible experience, and revelations of truth are critically important to a Jury . From His roots as an impoverished farm-worker add to his impressive qualifications as he easily connects with the average American.)   [Doc 241, Exhibit 10]]

24. "Friends" - Socially, the Plaintiff and his expert's relationship has always been "professional." In over 40 years, they have engaged in social activities perhaps twice. Their "friendship" is a professional one based upon mutual respect. In addition, the consultants used by plaintiff's expert are highly qualified, and do not engage in social activities with Mr. Flores. The Court misunderstood the term friendship. It should have been irrelevant. The fact that it was included in the decision is unsettling. If the Court wishes to compare qualifications between Plaintiff's Expert the City Staff...I am happy to do so. {Doc 241, Exhibits 13 & 14]

## ARGUMENT

The IPMC is included in the International Building Code, (IBC) as adopted by the City of Muskogee [Doc 194-2and **acknowledged** by both this Court and the Defendant as the primary controlling law. Furthermore, both this Court nor the City can disagree that the language and intent of the IPMC concerning DUE Process and Strict Liability is explicit and clear. That language is as follows:

1. "Chapter 1 [is largely concerned with maintaining] **"Due Process of Law"**...Only **through careful observation** of the administrative provisions can the building official reasonably expect to demonstrate that **"Equal Protection under the Law"** has been provided [page vii] . This Court, with all due respect, is denigrating the essence of the STRICT LIABILITY and Public Safety and Welfare law **when the words careful observation** are not applied to the IPMC. This Court has mis-applied a general conceptual holding "procedural due process analysis is not a technical conception with a fixed content unrelated to time, place and circumstances and calls for such

5

procedural protections as the particular situation demands "to a Strict Liability Statute in citing two irrelevant cases - **M.A.K. INV. GRP v. City of Glendale**, 897 F. 3d 1303,1308-09 ( 10th Cir. 2018 and **Pater v. City of Casper**, 646 F. 3d 1290-1298 ( 10th Cir. 2011). Neither of these cases are applicable because neither case involves Strict Liability law. The IPMC is technical and explicitly delineates time, place and circumstances which DEMANDS procedural protections. This is the difference between general law and specific Strict Liability law! Both of these cases cited by the Court are readily distinguishable from the case at bar. In contrast, the IPMC invokes Strict Liability on those who fail to adhere to its strict mandates especially concerning, [ See page 10 of IPMC], strict liability Offense; also **NOTICE. See Doc 241, Exh 1, 104.5 IPMC NOTICES AND ORDERS & 107.2 FORM OF NOTICE. The M.A. K. case is based on blight determinations or eminent domain. The Glendale case does NOT impose strict liability on the City nor its officers, the IPMC does. The Pater case arises out of a contract dispute between two landowners and the City of Casper regarding whether the landowners are obligated to reimburse the City for certain street improvements. Again, this case is a contractual dispute and does NOT involve a Strict Liability law. THE IPMC does!**

See **STATE of Minnesota, Respondent, v. John ARKELL, Appellant, Carriage Homes, Inc., Defendant,** C1-02-856, March 14, 2003

In this case, the City of Austin has incorporated the State Building Code 1 into its ordinances, **makes a violation of the State Building Code a misdemeanor** as does the IPMC in the present case. In the Arkell case **the state charged Carriage Homes and Arkell with three misdemeanor counts each, alleging a violation of the Uniform Building Code (UBC). The Court in its analysis considered several factors:**

1.  Did the district court err by determining that Minn.Stat. § 16B.69 (2000) is a public-welfare statute? The language in the case at bar involving the IPMC clearly identifies the IPMC as a public welfare law, see doc 241, Exh1.

2.  Did the district court err by determining that, Minn.Stat. § 16B.69 is a strict-liability statute? The IPMC specifically declares it to be a Strict Liability law, see Doc 241, Exh 1.

3.  Did the district court err by applying the responsible-corporate-officer doctrine? In the case at bar, the IPMC invokes the responsible-corporate officers doctrine. See Doc 241, Exh 1.

Hence, there is no question of the application of Strict Liability and the requirement of strict adherence to the mandates as delineated in the IPMC once these crucial factors are considered together with the language and intent of the IPMC.

The Court in Arkell declared that a public-welfare statute regulates conduct that is potentially harmful or injurious.  **In re C.R.M., 611** N.W.2d 802, 806 (Minn.2000); **Staples v. United States**, 511 U.S. 600, 607, 114 S.Ct. 1793, 1798, 128 L.Ed.2d 608 (1994) **(characterizing public-welfare statutes as regulating dangerous conduct**, devices, products, or materials).   Public-welfare statutes "pervasively affect activities which threaten human health and safety as well as the environment."   **In re Dougherty,** 482 N.W.2d 485, 489 (Minn.App.1992) (citation omitted), review denied (Minn. June 10, 1992).    Examples of such statutes include laws designed to regulate narcotics, see **United States v. Balint,** 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922), to prevent the adulteration of foods and drugs, **see United States v. Dotterweich,** 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), and to control hazardous waste**, United States v. Int'l Minerals & Chem. Corp.,** 402 U.S. 558, 91 S.Ct. 1697, 29 L.Ed.2d 178 (1971);   Dougherty, 482 N.W.2d at 489.

The IPMC 16B.69 regulates activities that pervasively affect human health and safety because the State Building Code protects the public's health, safety, and welfare. See **Dougherty**, 482 N.W.2d at 489 (describing hazardous-waste laws as public-welfare statutes because they control conduct that pervasively threaten human health and safety);  see also Minn.Stat. §  16B.59 (2000) (stating that State Building Code's purpose is to **"establish reasonable safeguards for health, safety, welfare, comfort, and security of the residents of this state"**);  UBC §  101.2 (1997)  The IMPC is part of the UBC, hence if in the **Arkell** case one would adduce that the UBC makes one liable for their violations then why would that reasoning not extend to the IPMC which is part and parcel of the UBC or the IBC. **("The purpose of this code is to provide minimum standards to safeguard life or limb, health, property and public welfare");  City of Minnetonka v. Jones Assoc., Inc.,** 306 Minn. 217, 222, 236 N.W.2d 163, 166-67 (1975**) (describing State Building Code's objectives as protecting the public's health and welfare);**  cf.   **State v. Young,** 192 Ariz. 303, 965 P.2d 37, 45 n. 7 (Ct.App.1998) **(describing violation of building code as example of public-welfare-statute violation).**

**In Arkell** the Court determined that because section 16B.69 enforces the State Building Code, the district court did not err by determining that section 16B.69 is a public-welfare statute.

7

**In Arkell** the Court reasoned that the district court determined that section 16B.69 of their law is a strict-liability statute because it does not on its face require culpable intent and because it is a public-welfare statute. In the instant case, there is no conjecture or analysis to be made. The IPMC specifically declares that those who violate its terms are strictly liable. [see Doc 241, Exh 1] The Court **in Arkell** already concluded that section 16B.69 is a public-welfare statute. Statutory construction is a legal determination, which is reviewed de novo. **In re A.A.E.,** 590 N.W.2d 773, 776 (Minn.1999). The object of this Court's review should be to ascertain and effectuate legislative intent. That intent is made clear in the Introduction portion of the IPMC. [see Doc 241, Exh 1]

The Court in **Arkell** stated, "Although this is a matter of first impression in Minnesota, we note that courts in other jurisdictions have determined that a showing of culpable intent is not necessary to establish a violation of a building code". See, e.g., **State v. Edelman,** 64 Conn.App. 480, 780 A.2d 980, 983 (2001) (concluding that defendant was subject to criminal liability for violation of Connecticut's uniform building code without a showing of culpable intent); **Young**, 965 P.2d at 45 n. 7 (noting that typically no evidence of culpable intent is required to subject defendants to criminal liability for violations of building codes). While courts may read into common-law crimes a mens rea requirement even where the statute does not expressly require it, there is no presumption that public-welfare statutes require proof of mens rea to establish liability. **C.R.M.,** 611 N.W.2d at 806.

The rationale is that public-welfare statutes impose liability for the "type of conduct that a reasonable person should know is subject to **stringent public regulation** and may seriously threaten the community's health or safety." Id. (quoting **Liparota v. United State**s, 471 U.S. 419, 433, 105 S.Ct. 2084, 2092, 85 L.Ed.2d 434 (1985)); see also **Morissette v. United States**, 342 U.S. 246, 256, 72 S.Ct. 240, 246, 96 L.Ed. 288 (1952) (noting that public-welfare statutes as matter of policy do not require a **showing of culpable intent because accused is usually in position to prevent violation).** A violation of a public-welfare statute impairs the efficiency of controls deemed essential to the social order as presently constituted.

In this respect, whatever the intent of the violator, the injury is the same. * * * Hence, legislation applicable to such offenses, as a matter of policy, does not specify intent as a necessary element.

**C.R.M.,** 611 N.W.2d at 806 (alteration in original) (quotation omitted).

8

Strict-liability statutes are generally disfavored, but the supreme court has inferred mens rea in statutes that are silent on the subject only when the statutes provide felony or gross-misdemeanor penalties. See, e.g., id. at 805, 809; **State v. Neisen,** 415 N.W.2d 326, 329 (Minn.1987); **State v. Strong**, 294 N.W.2d 319, 320 (Minn.1980). The United States Supreme Court **in Staples** stated that "the penalty imposed under a statute has been a significant consideration in determining whether the statute should be construed as dispensing with mens rea." 511 U.S. at 616, 114 S.Ct. at 1802. When the punishment imposed is only a light penalty "such as fines or short jail sentences," the Supreme Court has "construed [such] statutes to dispense with mens rea." Id. at 616, 618, 114 S.Ct. at 1802-03. Because a violation of the IPMC is a misdemeanor, the policy disfavoring strict-liability statutes is not implicated.

**Arkell** further argues that the rule of lenity requires that a mens rea requirement be inferred in section 16B.69. But the rule of lenity, which requires that ambiguity concerning the scope of a criminal statute should be resolved in favor of the defendant, has no application when a court finds **no ambiguity in a statute**. **State v. Loge,** 608 N.W.2d 152, 156 (Minn.2000) (holding that statute silent on mens rea does not require that state prove culpable intent to impose misdemeanor liability on driver of motor vehicle containing open bottle of intoxicating liquor). The language of section 16B.69 is clear and unambiguous: "A violation of the code is a misdemeanor." Because the statute is clear, the rule of lenity does not apply.

The Court in Arkell stated that, we conclude that the legislature intended to impose strict liability for violations of the State Building Code; therefore, the district court did not err by determining that section 16B.69 is a strict-liability statute.' Such is the case with the IPMC which specifically declares it as a Strict Liability law.

**In United States v. Park,** the United States Supreme Court described application of the responsible-corporate-officer doctrine to a violation of a public-welfare statute: "[T]he liability of managerial officers did not depend on their knowledge of, or personal participation in, the act made criminal by the statute. Rather, where the statute under which they were prosecuted dispensed with 'consciousness of wrongdoing,' an omission or failure to act was deemed a sufficient basis for a responsible corporate agent's liability. It was enough in such cases that, by virtue of the relationship he bore to the corporation, the agent had the power to prevent the act complained of".421 U.S. 658, 670-71, 95 S.Ct. 1903, 1911, 44 L.Ed.2d 489 (1975). Criminal liability under the responsible-corporate-officer doctrine, therefore, does not depend on "the knowledge of, or personal participation in, the

9

act made criminal by the statute." Id. at 670, 95 S.Ct. at 1911. It is enough in such cases that the officer had the power to prevent or cure the violation. Id. at 671, 95 S.Ct. at 1911; see **Dougherty,** 482 N.W.2d at 490 (explaining that defendant in Park was criminally liable under responsible-corporate-officer doctrine because he failed to prevent or correct adulteration of food that constituted violation of federal law).

To impose personal criminal liability on a corporate officer under the responsible-corporate-officer doctrine one must prove the violation by the corporation of a public-welfare statute, and that the defendant had, by reason of his position in the corporation, responsibility and authority either to prevent in the first instance, or promptly to correct, the violation complained of, and that he failed to do so. The failure thus to fulfill the duty imposed by the interaction of the corporate agent's authority and the statute furnishes a sufficient causal link**. Park,** 421 U.S. at 673-74, 95 S.Ct. at 1912.

See UBC § 103 (1997) (defining as illegal the act of person or corporation violating uniform building code in the construction of a building); see **also Brasch v. Wesolowsky**, 272 Minn. 112, 117, 138 N.W.2d 619, 623 (1965) (stating that general contractor had nondelegable duty to owner to use due care in the performance of his undertaking); **Bastian v. Carlton County Highway Dep't**, 555 N.W.2d 312, 316 (Minn.App.1996) (citation omitted) (stating that general contractors have responsibility to ensure that subcontractors comply with OHSA regulations), review denied (Minn. Jan. 7, 1997).

[t]he [State Building Code] violation was within Dan Hurd's sphere of influence. Hurd took no corrective action once the violations occurred in not complying with the specific language and mandates of the IPMC.

This Court is well aware, Strict liability is a legal term referring to the holding of an individual or entity liable for damages or losses, without having to prove carelessness or mistake. The doctrine of strict liability involves a claim which relies, not on wrongdoing, but on the inherent hazards of the situation or product. To explore this concept, consider the following strict liability definition.

Strict Liability incurred for causing damage or harm to life, limb, or property without the necessity of proving intent or negligence. Strict liability, also referred to as "absolute liability," applies to such issues as injuries or other damages caused by violating a strict liability statute or in this case a code embracing a mandated set of rules and procedures leaving no room for arbitrariness or spurious action. An individual or entity may be held strictly liable in both civil and criminal actions.

A strict liability tort holds a person or entity responsible for unintended consequences of his actions. In other words, some circumstances or activities are known to be fundamentally dangerous, so when something goes wrong, the perpetrator is held legally responsible. Such is the case at bar.

Fault in strict liability cases is not an issue. Therefore, proving that an injury or damages occurred, and that they occurred because of the plaintiff's activities or failure to act, becomes the focal point of any civil lawsuit on a strict liability tort. The law classifies three basic types of strict liability torts, though a plaintiff may argue that another situation, which does not fall within this list, falls under the umbrella of absolute liability. The types of strict liability torts include injuries or damages caused by the violator. Depriving one of their personal property and use of their real property by making 15 families homeless with many not having the ability to retrieve their personal belongings (no transportation) is egregious and shocking to any reasonable person especially in view of these circumstances as delineated in the undisputed facts and the Flores Exh A attached hereto.

As in the present case, the IPMC, statutes which impose sanctions for offenses against public health or safety must be on point with the case at bar. **see Morissette v. United States, 342 U.S. 246, 256-60 (1952); United States v. Dotterweich, 320 U.S. 277, 281 (1943) and including, recently, violations of environmental protection laws, see State v. Arizona Mines Supply Co., 107 Ariz. 199, 484 P.2d 619 (1971).**

Courts' Abuse of Discretion

1. This Court appears to ignore the fact that the IPMC is the controlling law Doc 241, EXH 1 , Sect 1.3 and the Flores affidavit attachment A as a world class expert. The Court further ignores crucial evidence and usurps its own opinion as if the admissions by the parties are irrelevant to this case. Hence, to ignore the evidence including the Defendant's own admission that the IPMC is the controlling law [ See DOC 241, Exh 3, Lane, City Expert, depo. , p. 28, lines 8-11, p. 30, lines 23-24, and p. 66, lines 10-12 is disturbing at best. Moreover, the responses to the Plaintiff's Interrogatories admitting that the IPMC is the controlling law in Oklahoma is conclusive of the relevance of the City's knowledge of the IPMC and its application, See Doc 241, Exh 17, #10 . Furthermore, the Defense Expert admits that Strict Liability is mandated and applies to the City officials in Oklahoma (See Doc 241, Exh 3 # Lane Depo, p 101, lines 1-25. **This Court ignores crucial and factual evidence while usurping this evidence to derive its own erroneous opinion. Hence, both parties' admissions and understanding are ignored.**

2. The IBC dos does not apply, See DOC 241 Exh 1, Sect 1.4 & Affidavit Attachment A. The Court again ignores the relevance of incontrovertible opinions by a world class expert and text of the relevant Code. Such has been utterly ignored. In spite of the fact that the **Defense acknowledges the IPMC is the controlling law** the City then attempts to ignore

the requirements of the IPMC to avoid the imposition of Strict Liability , to avoid the limitations on authority if Code officials fail to implement the intent and purpose of the IPMC by their failure to comply with all the requirements of the IPMC which demonstrates their desire to avoid their loss of immunity resulting from bad faith and malice. These factors are contained in the IPMC to protect the health and welfare of the public and to ensure that the public receives equal treatment and Due Process and protection of one's property rights. Hence, by this Court accepting the Defense falsehoods subverts the intent of the IPMC. What is most disturbing are the admissions and the LAW asserted by Plaintiff's expert which are being ignored, although these opinions are accurate and substantiated by the clear and convincing language of the IPMC. Such is disturbing at best. Furthermore, especially when the City's own expert, Lane, ADMITS that the IPMC is the controlling law NOT the IBC. Again, this Court ignores crucial evidence without consideration of both the City and Plaintiff's experts. See Doc 241, Exh 3, pps. 28, 30, 66 & 101. In addition, this Court falsely assumes that the damaged wiring was the main supply line from unit 12 to feeder sub panels into 4 & 1. See Doc 241, EXh 8, p3 . Both Jeff Strickland and Robert Lane ADMIT the main electrical supply line was unscathed. Hence, there was never a wiring hazard therefore negating any issue of arching or sparking to the main box or the wiring in the affected apartment #6. Both Strickland and Hurd further admitted to Plaintiff that the main feeder line was unscathed by the fire. Moreover, the City Officials had never mentioned damaged wiring as a hazard until 2-20-20 Hurd's deposition, therefore why is this Court claiming I was told about damage to wiring as a hazard was at 2-20-20 NOT on 6-20-18 NOT 6-21-18 as this Court assumes. All parties agreed the MAIN FEEDER LINES IN THE CEILING WERE UNSCATHED. The lines that feed the sockets & lights were the only lines affected by the fire but NOT the main conduit. See Doc 241, Exh 8, p 3—Lane 's depo & Exh 3, p 73, lines 19-74. Lane mistook the overhead wiring for the main feeder line in conduit. DOC 241 Exh 3 p, 109, pps 14-16 admits supply line was unscathed and hence corrupted his own expert report. Moreover, per this admission by Lane, there was ABSOLUTELY NO NEED TO REMOVE THE METER WHICH IS CONSISTENT WITH THE FLORES REREPORT OF 6-21-18. Lane agrees with the Flores report assessment that the Renfro Tech simply had to identify the dead or live wires per the See DOC 241, Exh 1, IPMC, 108. The Court ignores this critical mandate of the IPMC to verify any hazards prior to needlessly pulling a meter concerning the safety and welfare of fifteen families. This MANDATED procedure was NOT performed prior to pulling the meter. Defense Attorney admits in Doc 244, that Lane was not hired as a Code expert, hence without that expertise how can this Court legitimatize any of Lane's opinions concerning the Code or the violations thereof.

3. **Hazard** -in accordance with the IPMC procedural Due Process demands that (1) a qualified expert perform an inspection to ensure that a hazard exists that is a significant and imminent hazard to the safety and welfare of the public as described in IPMC

108.1.1 through 108.1.5 . See Doc 241, Exh 1, p 23; See also Exh 1 (2) an imminent hazard is identified by an electrical expert; (2) must establish whether the hazard can be repaired on site or, whether or not disconnection of service utilities are warranted. See Doc 241, Exh 15, p 3, Exh 4-Jones Depo p 26, line 15 to page 28, line 9-Jones Depo "not an electrician , knows little about electricity, was directed by Hurd to remove the meter despite his position as a Fire Marshal, could not pass basic electrical test given, NOT trained on Hazards [Exh 15, p4, Not trained for hazards-Exh 4, p 21, lines 4-8 & p31 line 19 to p34 line 4.

**Procedural Due Process**

Hence, upon review of the evidence. The explicit steps that must be followed by City Officials AND WERE NOT cannot be ignored by this Court if justice is to prevail.

This Court must and should acknowledge and apply the IPMC in order to substantiate that Plaintiff's Procedural Due Process Rights were violated for lack of Notice and other procedural aspects as per the IPMC . See Doc 241, Exh 1, Section 108. Notice requirements, for example, are explicitly delineated in the IPMC and leaves no room for discretion or latitude in its application. However, if this Court persists in denying the Strict Liability application of a Strict liability Statute, then such is in direct violation of Plaintiff's US Constitutional and Civil Rights.

Moreover, the evidence overwhelmingly demonstrates numerous aspects of violations of Plaintiff's procedural Due Process Rights and is fully explained with specific reference to Hurd & Jones depositions demonstrating that both Jones and Hurd were extremely incompetent and could not render an informed and qualified decision to identify a legitimate hazard nor properly respond to that assumed hazard. See Doc 241, Exh 15 p 4 & 5 which explicitly identifies their incompetence with supporting references to their respective depositions. Jones, in his deposition accuses Hurd of making the decision to pull the meter despite the fact Hurd never came to the scene. Hurd in turn claims that Jones influenced him to pull the meter and make 15 families homeless. IN this view, this Court should be shocked as to the removal of a meter that made 15 families homeless as a direct result of TWO CITY OFFICUIALS THAT ARE INCOMPETENT & UNQUALIFIED AND UTTERLY FAILED TO FOLLOW PROPER IPMC PROTOCAL & MANDATES EXPLICITLY SET OUT IN THE CODE. To claim that spanking a child is more disturbing than making 15 families homes beyond shocking in comparison especially as a result of blatant incompetence. Hurd admits he did not go to the scene to determine and follow protocols per the IPMC, Doc 241, Exh 5 , p 41, lines 17-18 Hurd ADMITS he never came to the scene despite being less than 7 miles away. Hence, this must be alarming to anyone knowing that a critical decision about the safety and welfare of the public was made without DUE DILIGENCE, Doc 241, EXH 5, p 42, lines 2-8—Hurd climes that Jones influenced him to remove the meter despite Jones acknowledging his incompetence regarding electricity. Talk about the blind leading the blind!!! This should be more than

shocking to any reasonable prudent person. Could this be why the IPMC was enacted, to protect the safety and welfare of the community. There is NO latitude or tolerance for NOT following the law. Common sense should tell us why the IPMC is so specific in its mandates.

**Substantive Due Process Violations**

If having one's procedural Due process violated is not enough then consider the hearing that occurred 4 months after the removal of the meter.

The City Appeals Board did not have a qualified engineer or electrical expert to provide the city with good advice in line with the IPMC. All City members were not ware of the significance of the IPMC and its application to the case at bar. The IPMC requires that the Appeal Board Members be properly qualified and knowledgeable about the code. See Doc 241, Exh 1, 111.2, must provide proper notice with proper content , 111.1, CONFLICT OF INTEREST- Moore was an electrician sitting on the hearing board and was ENGAGED BY THE PLAINTIFF to be hired as an electrician to do work at the subject apartments, despite being hired by the City and paid by the City to hear the case, 111.2.3, Appeal Board must provide procedure & abide by same 11.4.1–did not do so— Flores was constantly cut off and not allowed to testify, Board Members did not follow procedure as verbally represented and did not have proper knowledge of the IPMC , Section 111. Must be able to properly identify a hazard, see 111.8 . More disturbing than the incompetence, lack of knowledge is that their decision violated the Code on two levels if not more. concerning panels and attic separators. During the hearing Strickland attempts fraudulently to convince the Board that the meter needed to be changed out for higher amperage. Plaintiff proved otherwise (cite)

Wherefore, based on the foregoing and especially in light of the IPMC and its legislative intent, and a world class expert's opinion, Plaintiff respectfully requests that this Court alter/modify its judgment and opinions rendered in DOCS 247 & 248 and find in favor of the Plaintiff. Moreover, due to this pending motion Plaintiff respectfully requests this Court to toll the time to respond to Defendant's Bill of Costs submitted in Docs 249 & 250.

Respectfully Submitted,

Dr. Elias Quintana

CERTIFICATE OF SERVICE

I, Dr. Elias Quintana, prop se, hereby certify that on June 30, 2022, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrant: John J. Love jjl@lovelawfirm.legal

*[signature]*